**SAUL EWING LLP**

Erik P. Pramschufer

1270 Avenue of the Americas, Suite 2800

New York, NY 10020

Tel: (212) 980-7216

erik.pramschufer@saul.com

Gary B. Eidelman (*pro hac vice* to be filed)

1001 Fleet Street, 9th Floor

Baltimore, MD 21202

Tel: (41) 332-8975

gary.eidelman@saul.com

*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| CIARA STAFFORD, | Case No. _____ |
| Plaintiff, | CIVIL ACTION |
| v. | **NOTICE OF REMOVAL** |
| FISERV SOLUTIONS LLC and CLOVER NETWORKS, INC., | ***Document Filed Electronically*** |
| Defendants. | |

TO:   Usmaan Sleemi

LAW OFFICES OF USMAAN SLEEMI LLC

66 Route 17 North, Suite 500

Paramus, NJ 07652

*Attorney for Plaintiff*

**PLEASE TAKE NOTICE** that Defendants, Fiserv Solutions LLC and

Clover Network, LLC (improperly captioned as Clover Networks, Inc.), hereby

remove to the U.S. District Court for the District of New Jersey the above captioned

53211497.3

action, originally filed as Case No. UNN-L-003625-24 in the Superior Court of New Jersey, Law Division, Union County (the "State Court"). The basis for this Court's jurisdiction and the Defendants' grounds for removal are set forth below.

## STATEMENT OF JURISDICTION AND VENUE

1.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(a), thus making removal proper under 28 U.S.C. § 1441, as Plaintiff and the Defendants are of diverse citizenship, and the amount in controversy exceeds $75,000.

2.    This Court is the proper venue for this action to be removed, since it is the district and division covering the place where this action was first filed. 28 U.S.C. § 1446(a).

## PLAINTIFF'S COMPLAINT AND PROCEDURAL HISTORY

3.    This is a case for alleged employment discrimination and retaliation against the Defendants pursuant to the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1, *et seq.* ("NJLAD"), in addition to state common law claims.

4.    Plaintiff filed her Complaint against the Defendants in State Court on or about October 3, 2024. A true and accurate copy of Plaintiff's Complaint filed in State Court is attached as **Exhibit "A**."

5.    A true and accurate copy of the State Court's Track Assignment Notice issued on October 4, 2024 is attached as **Exhibit "B**."

6.    On October 6, 2024, the undersigned law firm accepted service on behalf of the Defendants. True and accurate copies of the Acknowledgement of Service executed by the undersigned law firm with respect to each Defendant, and filed by Plaintiff on the State Court's docket, are attached as **Exhibits "C" and "D."**

7.    The attached exhibits are all of the documents filed with the State Court in this action.

8.    No Defendants have answered Plaintiff's Complaint.

9.    There are no motions currently pending in State Court.

10.    All Defendants consent to this action being removed to this Court.

**STATEMENT OF FACTS SUPPORTING DIVERSITY JURISDICTION**

11.    Pursuant to 28 U.S.C. § 1332(a), the federal district courts shall exercise jurisdiction over any action where the amount in controversy exceeds $75,000, and the action is between "citizens of different States."

12.    Plaintiff pleads in her Complaint that she is a citizen of Pennsylvania.

13.    Defendant Fiserv Solutions LLC is a Wisconsin limited liability company with its principal place of business located in Wisconsin. Its sole member is Fiserv, Inc., a Wisconsin corporation with its principal place of business located in Wisconsin.

14.    Defendant Clover Network, LLC is a Delaware limited liability company with its principal place of business located in Wisconsin. Its sole member

is First Data Merchant Services LLC, a Florida limited liability company with its principal place of business located in Georgia. In-turn, First Data Merchant Services LLC's sole member is First Data Corporation, a Delaware corporation with its principal place of business located in Wisconsin.

15.    None of the Defendants are citizens of Pennsylvania. Therefore, diversity of citizenship exists between Plaintiff and each of the Defendants for purposes of 28 U.S.C. § 1332(a).

16.    Although Plaintiff's Complaint does not demand an amount certain pursuant to local pleading practice, Defendants believe and aver in good faith that the amount in controversy exceeds $75,000, exclusive of interest and costs.

17.    Plaintiff seeks in her Complaint *inter alia* back pay, front pay, compensatory damages and punitive damages under the NJLAD, for which Defendants believe Plaintiff will demand in excess of $75,000. For example, based upon Plaintiff's rate of pay at the time of her separation, Plaintiff's claim for back pay will exceed the jurisdictional threshold by the time of trial.

## OTHER PROCEDURAL REQUIREMENTS

18.    This Notice is timely under 28 U.S.C. § 1446(b) because it has been filed within 30 days following the Defendants' original receipt of the Complaint.

19.    This Notice constitutes the notice of removal required by the removal statute. *See* 28 U.S.C. § 1446(a). Further, as required by 28 U.S.C. § 1446(a), all the

53211497.3

process, pleadings and orders served upon Defendants, and otherwise filed in the State Court, are attached as Exhibits A through D.

20.    Pursuant to 28 U.S.C. § 1446(d), Defendants will serve a copy of this Notice on counsel for Plaintiff, and will file a copy with the Clerk of the Superior Court of New Jersey, Union County.

## RESERVATION OF DEFENSES

21.    By removing this action Defendants do not waive any defenses available to them. *See Danziger & De Llano, LLP v. Morgan Verkamp LLC*, 948 F.3d 124, 132 (3d Cir. 2020) (removal to federal court does not waive defenses based upon lack of personal jurisdiction or any other defenses "that a defendant would otherwise have in state court").

**WHEREFORE**, the Defendants respectfully request that this action be removed from the Superior Court of New Jersey, Law Division, Union County, to the U.S. District Court for the District of New Jersey.

Dated: October 23, 2024                Respectfully submitted,

                                       **SAUL EWING LLP**
                                       *Attorneys for Defendants*

                                       By: */s/ Erik P. Pramschufer*
                                       Erik P. Pramschufer
                                       Gary B. Eidelman (*pro hac vice* to be filed)

53211497.3

## <u>CERTIFICATE OF SERVICE</u>

I, ERIK P. PRAMSCHUFER, hereby certify that on October 23, 2024, the foregoing Notice of Removal was electronically filed through the Court's CM/ECF system.

I further certify that a copy of the aforementioned Notice was/will be served via electronic mail and the Superior Court of New Jersey's electronic filing system (eCourts) to:

Usmaan Sleemi
LAW OFFICES OF USMAAN SLEEMI LLC
66 Route 17 North, Suite 500
Paramus, NJ 07652
*Attorney for Plaintiff*

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, then I may be subject to punishment.

Dated: October 23, 2024

*/s/ Erik P. Pramschufer*
Erik P. Pramschufer

53211497.3

# **Exhibit A**

**LAW OFFICES OF USMAAN SLEEMI LLC**
Usmaan Sleemi, Esq. [NJ ID 043072009]
66 Route 17 North, Suite 500
Paramus, NJ 07652
T: 973.866.9415 | F: 973.775.9584
usleemi@sleemilaw.com
Attorneys for Plaintiff

| | |
|---|---|
| CIARA STAFFORD,<br><br>                              Plaintiff,<br><br>          v.<br><br>FISERV SOLUTIONS LLC AND CLOVER NETWORK, INC.,<br><br>                              Defendants. | SUPERIOR COURT OF NEW JERSEY<br>UNION COUNTY – LAW DIVISION<br><br>DOCKET NO.<br><br>CIVIL ACTION<br><br>**COMPLAINT** |

Plaintiff Ciara Stafford ("Stafford" and/or "Plaintiff"), residing at 631 Lincoln Avenue, in the Borough of Morrisville, in the County of Bucks, Pennsylvania, states by way of Complaint against Defendants Fiserv Solutions LLC ("Fiserv") and Clover Network, Inc. ("Clover") (collectively referred to herein as "Defendants"):

## <u>FACTUAL ALLEGATIONS</u>

1.      Fiserv, together with its subsidiaries, provides payments and financial services technology services in the United States, Europe, the Middle East, Africa, Latin America, the Asia-Pacific, and internationally.

2.      Clover, a subsidiary of Fiserv, provides point-of-sale and business management solutions to small and mid-size businesses.

3.      While Fiserv was Stafford's ostensible employer, Fiserv and Clover are in effect one company and a single and/or joint employer.

4.      There is a functional integration of operations between Fiserv and Clover.

5.      Fiserv and Clover share the same office, located on the fourth floor of a four story office building located at 100 Connell Drive, Berkeley Heights, New Jersey 07922.

6.      Fiserv and Clover share employees, equipment, records, and a computer system.

7.      Fiserv and Clover employees attend the same holiday party and the same informational meetings about changes in products and/or product functions.

8.      Upon information and belief, Fiserv and Clover employees enjoy the same employee benefits.

9.      There is common management between Fiserv and Clover.

10.     Fiserv/Clover employed Stafford, a petite 28 year old woman, from on or around January 17, 2023 to on or around July 27, 2024.

11.     Stafford worked for Fiserv/Clover as a software engineering apprentice at Clover.

12.     Nherhu Rochester ("Rochester"), a 26 or 27 year old male competitive powerlifter, started at Fiserv/Clover as a software engineering apprentice at Clover around the same time as Stafford.

13.     Stafford and Rochester, along Emil Deleon ("Deleon") and Botirjon Masharipob ("Masharipob"), two other software engineering apprentices at Clover, made up the Clover Sport support team.

14.     On or around April 19, 2023, Stafford and Rochester, who worked remotely for the first 90 days of their employment with Fiserv/Clover, began working at Fiserv/Clover's Berkley Heights, New Jersey office on a hybrid schedule, working at the office three days per week and remotely two days per week.

15.     Fiserv/Clover's Berkeley Heights office has an open layout, and all Fiserv/Clover employees, including management, work in the same space.

16.   At Fiserv/Clover's Berkeley Heights office, Rochester and Stafford sat side-by-side in adjacent cubicles.

17.   During Stafford's employment with Fiserv/Clover, Rochester regularly made sexually inappropriate comments to Stafford, repeatedly sexually propositioned Stafford, and sexually assaulted Stafford on multiple occasions.

18.   Shortly after Stafford and Rochester began working at Fiserv/Clover's Berkeley Heights office, Rochester began making unwanted sexual advances towards and sexually inappropriate comments to Stafford.

19.   During Stafford's employment with Fiserv/Clover, software engineering apprentices regularly ate lunch together in the office building cafeteria, which is located on the first floor of the building.

20.   One day in or around late April 2023, Rochester, who was walking back to Fiserv/Clover's office from the office building cafeteria with Stafford after having just had lunch with Stafford and a few other software engineering apprentices, asked Stafford if she would go out on a date with him.  Stafford, who was surprised that a co-worker she barely knew and had not shown any interest in would ask her out on a date, told Rochester no and then quickly changed the subject.

21.   A day or two later, Rochester, who was walking back to Fiserv/Clover's office from the office building cafeteria with Stafford after having just had lunch with Stafford and a few other engineering apprentices, asked Stafford if she would stop him if he tried to kiss her. Stafford, who was shocked that Rochester would say something like this, especially after she had just turned him down, responded yes and then quickly changed the subject.

22. On or around May 1, 2023, Rochester sent a direct message to Stafford on Instagram in "Vanish Mode," telling her how nice her lips are. Vanish Mode is a feature on Instagram that allows users to send self-destructing messages, i.e. messages that automatically disappear after the recipient of the message reads it.

23. On or around the evening of May 4, 2023, Stafford exchanged several text messages with Rochester, making it clear that she would only be friends with him. During the course of this exchange, Rochester acknowledged that he had told Stafford that he wanted to kiss her.

24. Despite Stafford making it clear to Rochester that she would only be friends with him, Rochester began to regularly make sexually inappropriate comments to Stafford, such as "You have a chokeable neck;" "it's difficult sitting next to you all day when I want to have sex with you so badly;" and telling Stafford, who had a hickey on one side of her neck, that "you should let me put a hickey on the other side of your neck."

25. On or around the morning of May 12, 2023, Stafford and the other software engineering apprentices at Clover had a "standup meeting" with Adam Deane ("Deane"), Stafford's immediate supervisor and head of quality engineering at Fiserv, on Google Meet, a video communication service developed by Google.

26. A stand up meeting is a regularly held gathering – typically daily – during which team members share status reports on their work. They are often held while attendees stand, which helps ensure a short check-in rather than a lengthy discussion.

27. That afternoon, Deane, who was at the time working from Fiserv/Clover's Austin, Texas office and would not start working at Fiserv/Clover's Berkeley Heights office until late 2023, sent Stafford a message on Slack, a workplace messaging tool through which

employees can exchange messages and files instantly, asking her if she was available for a one-on-one meeting. A few seconds later, Stafford sent a message to Deane in response saying that she was.

28. Deane then sent Stafford a Google Meet video call invitation on Slack, which Stafford immediately clicked on to join the Google Meet video call with Deane.

29. During this one-on-one meeting, Deane and Stafford discussed what was and what was not going well at work so far. While discussing what was not going well at work, Stafford informed Deane that somebody on their team had been making unwanted advances towards her and inappropriate sexual comments to her, including sending her a message on Instagram in Vanish Mode saying how nice her lips are, and that, in an effort to get that person to stop, she had made clear to him that she would just friends with him, but that his sexually inappropriate behavior towards her was still continuing. In response, Deane told Stafford that if she was feeling uncomfortable, she should report the situation to human resources. Stafford told Deane that she was afraid of the person, but that she would again try to make it clear to him that she would just be friends with him.

30. A few minutes after Stafford and Deane's one-on-one meeting ended, Stafford sent Deane a screenshot of her May 4, 2023 text message exchange with Rochester – in which she made it clear that she would only be friends with him and in which Rochester acknowledged that he had told Stafford that he wanted to kiss her – on Slack.

31. A few minutes later, Deane, in response, sent a sad panda bear emoji and an index finger pointing up emoji to Stafford.

32. Fiserv/Clover did not take any action to stop Rochester's sexual harassment of Stafford after Stafford complained to Deane about Rochester's sexual harassment of her.

33.    Moreover, not only did Rochester continue to make sexually inappropriate comments to and unwanted sexual advances towards Stafford on a regular basis, his sexual harassment of Stafford escalated into sexual assault.

34.    One day in or around late May 2023, Stafford, Rochester, and Masharipob went downstairs to the office building mailroom, which is located on the first floor of the office building, to check to see if some Clover point-of-sale devices that Deane had sent to each of them to conduct software testing on had arrived.

35.    When Stafford, Rochester, and Masharipob arrived to the office building mailroom, Stafford was able to pick up the Clover point-of-sale device that Deane had sent to her. The Clover point-of-sale devices that Deane had sent to Rochester and Masharipob, however, had not yet arrived.

36.    After Stafford picked up the Clover point-of-sale device that Deane had sent to her, Stafford, Rochester, and Masharipob began to walk back to Fiserv/Clover's office.

37.    While Stafford, Rochester, and Masharipob were walking back to Fiserv/Clover's office, Rochester who was walking behind Stafford, began playing with Stafford's bra straps and touching the area of Stafford's body around her bra straps.

38.    A few days later, Stafford and several other software engineering apprentices at Clover – Fatima Kaba ("Kaba"), Aaron Mendez ("Mendez"), Gabriel Rivera ("Rivera"), and Rochester – had lunch together in the office building cafeteria.

39.    After Stafford, Kaba, Mendez, Rivera, and Rochester finished eating lunch, they went outside to the office building's courtyard.

40.    After entering the office building's courtyard, Rochester and Mendez sat down at a chess board table that was in the courtyard and began playing chess, while Stafford, Kaba, and

Rivera sat on a bench next to the chess board table where Rochester and Mendez were playing chess.

41.   While Rochester and Mendez were playing chess, Rochester, who is extremely large and physically imposing, turned to Rivera and Kaba, who were engaged in conversation with each other, and said, "One thing I can't stand is when people are talking while I'm playing chess.  The last time someone did that, I almost fought them."

42.   On or around May 25, 2023, Stafford and Deane had another one-on-one video meeting on Google Meet.  During this meeting, Stafford informed Deane that the same person who was sexually harassing her had threatened Rivera and Kaba while he was playing chess in the office building courtyard with another software engineering apprentice and proceeded to tell Deane about the incident.  Stafford then told Deane that everyone on the team seemed afraid of this person because he was a large male powerlifter.  Deane, who was well aware that Rochester was a powerlifter since Rochester always brought up his powerlifting during stand up meetings, told Stafford that those things would not happen once he started working from Fiserv/Clover's Berkeley Heights office.

43.   Fiserv/Clover did not take any action to stop Rochester's sexual harassment of Stafford even after Stafford complained to Deane a second time about Rochester's sexual harassment of her and Rochester's sexual harassment of Stafford continued.

44.   One day in or around June 2023, several software engineering apprentices at Clover, including Stafford and Rochester, went downstairs to the office building cafeteria to have lunch together.

45.     Because the stairwell in Fiserv/Clover's office leads directly to the office building cafeteria, the software engineering apprentices almost always took the stairwell to the building cafeteria.

46.     On that particular day, Stafford, who was the last one to enter the stairwell, saw Rochester, who was walking in front of her, stop to wait for her.

47.     Once Stafford caught up to Rochester, Rochester let Stafford pass him.

48.     After Stafford passed Rochester, Rochester grabbed Stafford from behind and pulled her against his crotch, pressing his penis into her buttocks.  Stafford, who is approximately half of Rochester's weight, pushed Rochester off of her and then continued down the stairwell to the office building cafeteria.

49.     Soon thereafter, Stafford, in the hopes that Rochester would stop his sexually inappropriate behavior with her, told Rochester that she was seeing someone.

50.     After Stafford told Rochester this, Rochester backed off from Rochester for a couple weeks.

51.     One day in or around July 2023, Rochester, who had seemingly changed his behavior towards Stafford, asked Stafford if she wanted to go to Chick-fil-A for lunch.  Stafford, who thought Rochester had finally changed his behavior and wanted to maintain a good relationship with all of her co-workers, told him that she would go.

52.     That day, Stafford and Rochester drove to the Chick-fil-A in Watchung, New Jersey in Rochester's car and had lunch there.

53.     After having lunch at the Chick-fil-A in Watchung, Stafford and Rochester drove back to Fiserv/Clover's Berkeley Heights office in Rochester's car.

54.    Rochester did not say or do anything inappropriate during this lunch or during the drive to or from Chick-fil-A.

55.    Approximately one week later, Rochester, who had been maintaining his appropriate behavior with Stafford, again asked Stafford if she wanted to go to Chick-fil-A for lunch. Stafford, who believed that Rochester had changed and wanted to maintain a good relationship with her co-workers, told him that she would go.

56.    That day, Stafford and Rochester drove to the Chick-fil-A in Watchung in Rochester's car and had lunch there.

57.    After Stafford and Rochester finished having lunch at the Chick-fil-A in Watchung, Stafford and Rochester got back into Rochester's car to go back to Fiserv/Clover's Berkeley Heights office.

58.    A few seconds after Stafford and Rochester got into Rochester's car, Rochester grabbed Stafford's face and pulled it towards him and kissed her. Stafford immediately pulled away from Rochester and told him that they needed to get back to the office.

59.    Rochester and Stafford then drove back to Fiserv/Clover's office in Rochester's car.

60.    One day in or around early August 2023, Rochester told Stafford that Deane had told him that Fiserv/Clover was going to convert him and Deleon into full-time employees and was going to let Stafford and Masharipob go once their apprenticeship was over.

61.    Around this same time, Stafford, who had been selected by Clover/Fiserv for a part in a commercial for the Clover software engineering apprenticeship program, found out from several co-workers that Rochester had been telling other Fiserv/Clover employees that the only reason Stafford, who is a Black woman, had been selected for a part in the commercial was because she is a Black woman.

62.     Soon thereafter, Stafford had a one-on-one video meeting with Deane, who was still working from Fiserv/Clover's Austin, Texas office, on Google Meet.  During this meeting, Stafford, who had just about had it with Rochester, complained to Deane that Rochester had told her that Deane had informed him that Fiserv/Clover was going to convert Rochester and Deleon into full-time employees and was going to let Stafford and Masharipob go at the end of the apprenticeship and had been telling their co-workers that the only reason that Fiserv/Clover had given her a part in a commercial is because she is a Black woman.  Stafford then complained to Deane that Rochester was "toxic" and that she did not understand how Fiserv/Clover could allow Rochester, who was also the one who was sexually harassing her and the one who had threatened Rivera and Kaba while playing chess, to continue getting away with his behavior.

63.     Deane, however, ignored Stafford's complaints about Rochester and re-directed the conversation into trying to convince Stafford that Rochester had "misconstrued" what he had told Rochester.

64.     Fiserv/Clover did not take any action to stop Rochester's sexual harassment of Stafford even after Stafford complained to Deane a third time about Rochester's  sexual harassment of her and Rochester's sexual harassment of Rochester continued.

65.     Thereafter, Rochester continued to make sexually inappropriate comments to Stafford on a regular basis.

66.     One day in or around early August 2023, Rochester told Stafford, who was wearing a dress that day, "You have a dress on today, so we should definitely go to Chick-fil-A."  Stafford declined Rochester's invitation.

67.   On or around August 29, 2023, Deleon called a team meeting with all of the software engineering apprentices at Clover, including Stafford and Rochester.

68.   During this meeting, Deleon, who had no authority over any of the other software engineering apprentices, told each of the other software engineering apprentices what they needed to be working on and what they should be doing, which appeared to offend the other software engineering apprentices.

69.   Immediately after the meeting, Rochester, who appeared to be perturbed about what had just transpired in the meeting, asked Stafford if she could go for a walk with him around the office.  Stafford, who herself was taken aback about what had just transpired in the meeting and wanted to talk about it, told Rochester yes.

70.   Rochester and Stafford then walked out of Fiserv/Clover's office and started talking about what had just transpired in the meeting.

71.   While Rochester and Stafford were walking and talking, Stafford noticed that Rochester was headed towards the fourth floor elevators.

72.   When Stafford realized that Rochester was walking towards the fourth floor elevators, Stafford asked Rochester why they were going to the elevator.  Rochester told Stafford that he had to get his chapstick from his car and told Stafford that she should come with him so that they could continue their conversation.

73.   Rochester and Stafford then took the elevator to the first floor of the office building.

74.   After arriving to the first floor of the office building, Rochester and Stafford exited the elevator on the first floor and then walked outside to the parking lot to Rochester's car.

75.   Rochester and Stafford continued to talk about the meeting with Deleon while walking to Rochester's car.

76.     Once Rochester and Stafford got to Rochester's car, Rochester and Stafford stood outside of Rochester's car and continued to discuss the meeting.

77.     While Rochester and Stafford were discussing the meeting outside of Rochester's car, Rochester told Stafford that they still had 15 minutes until they had to go back inside and should finish the conversation in his car.

78.     Stafford, who suspected that Rochester was going to try something inappropriate with her and wanted to have an audio recording of his inappropriate behavior to give to Fiserv/Clover since Fiserv/Clover did not do anything in response to her previous complaints about Rochester, opened the Voice Memos application on her iPhone and pressed the record button and then got into the front passenger seat of Rochester's car while Rochester got into the driver's seat of his car.

79.     A few minutes after getting into Rochester's car, Rochester changed the topic of conversation to Stafford's part in the commercial that Fiserv/Clover had just shot for the Clover software engineering apprenticeship program.

80.     While Rochester and Stafford were discussing the commercial, Rochester abruptly said to Stafford, "Can I tell you that I really want to kiss you?"

81.     Rochester then grabbed Stafford and tried to kiss her.  Stafford pushed Rochester off of her.

82.     A few seconds later, Rochester again grabbed Stafford and tried to kiss her.  Stafford pushed Rochester off of her again and told him that they needed to get back to work.

83.     Stafford then got out of Rochester's car and walked back to Fiserv/Clover's office.

84.     That afternoon, Stafford sent a message to Mardel Nesby ("Nesby"), the vice president of human resources at Clover, on Slack saying that she needed to talk to someone about an

incident involving a co-worker.  A few minutes later, Nesby sent Stafford a message on Slack telling her to schedule a meeting with him and a link to his Calendly, a meeting scheduling software.

85.   Almost immediately thereafter, Stafford scheduled a meeting with Nesby for later that afternoon.

86.   Later that afternoon, Stafford had a video meeting with Nesby on Google Meet.

87.   During this meeting, Stafford complained to Nesby that, earlier that day, Rochester had lured her to his car, where he tried to kiss her against her will twice and told Nesby that she had recorded the incident on her phone.  Stafford also complained to Nesby that Rochester had been sexually harassing her on a regular basis since she started working from the office and reported several of the other sexual harassment incidents to Nesby – including the incident in which Rochester had played with her bra straps and touched the area of her body around her bra straps, the incident in which Rochester grabbed her from behind and pulled her against his crotch, pressing his penis into her buttocks, and a number of the sexually inappropriate comments that Rochester had made to her – and told Nesby that, in an effort to get Rochester to stop, she had made it clear to him very early on that she would just be friends with him, but that, despite this, his sexually inappropriate behavior towards her continued.   Further, Stafford informed Nesby that she and the other software engineering apprentices were afraid of Rochester because he was a large male powerlifter with a short temper who had threatened other employees before and told Nesby about the incident in which Rochester threatened Rivera and Kaba while he was playing chess in the office building courtyard with Mendez.

88.   In response, Nesby asked Stafford if she would feel more comfortable sharing details of Rochester's sexually inappropriate behavior towards her with Brenna Johnson ("Johnson"), the director of human resources at Clover, since Johnson is a woman. Stafford told Nesby that she would be more comfortable talking about the situation with Johnson since she is a woman.

89.   Nesby then told Stafford that he would arrange a meeting between her and Johnson and then concluded the meeting by telling Stafford that Fiserv/Clover would be conducting an investigation into her allegations and that it was possible that the investigation could lead to either the termination of her or Rochester's employment.

90.   A few minutes after Stafford's meeting with Nesby concluded, Stafford sent the audio recording of Rochester trying to kiss her against her will in his car to Nesby on Slack.

91.   A few days later, Stafford had a video meeting with Johnson on Google Meet. During this video meeting, Stafford told Johnson that Rochester had been sexually harassing her since she began working from the office and reported the incidents of sexual harassment to Johnson. Stafford also told Johnson that, in an effort to get Rochester to stop, she had made it clear to him very early on that she would just be friends with him, but that, despite this, his sexually inappropriate behavior towards her continued.

92.   In response, Johnson told Stafford that Fiserv/Clover would be conducting an investigation into her allegations and that she could work from home during that time.

93.   The next few days, Stafford worked from home while Fiserv/Stafford conducted an "investigation" into Stafford's allegations.

94.   One day in or around early September 2023, Stafford had a video meeting with Johnson and Deane on Google Meet. During that video meeting, Johnson informed Stafford that

Fiserv/Clover had completed its investigation of her allegations and was able to "substantiate" most of them.  After informing Stafford of the conclusions of Fiserv/Clover's investigation, Johnson asked Stafford whether she would like her seat moved or whether she wanted Fiserv/Clover to move Rochester's seat.  Stafford told Johnson that Fiserv/Clover should move her seat because she was afraid of Rochester and was not sure what he would do if she had Fiserv/Clover move his seat.

95.  At the end of the meeting, Stafford asked Johnson if Rochester speaking negatively about her after she reported him for sexual harassment would be considered retaliation.  Johnson responded that it would be.

96.  On or around September 7, 2023, Stafford returned to work at Fiserv/Clover's Berkeley Heights office.

97.  On or around the morning of September 11, 2023, Stafford, after arriving to work that morning, found Rochester – who had not been in the office since she had returned to the office on or around September 7, 2023 – sitting in her new cubicle, causing her to have a panic attack.

98.  On or around September 13, 2023, Stafford called out of work for mental health reasons.

99.  That evening, Daniel Volchek ("Volchek"), another software engineering apprentice at Clover, called Stafford and informed her that Rochester had said some things about her to him, Deleon, Mendez, and Johnny Viracocha ("Viracocha"), another software engineering apprentice at Clover, during lunch that day, but that he did not want to share what Rochester had said because he did not want to upset her.

100.  The following day at work, Deleon informed Stafford that, while she was out of work the previous day, Rochester had told him, Volchek, Mendez, and Viracocha that he did not

understand why Stafford had reported him for sexual harassment when she was actually the one constantly telling him that she wanted to have sex with him and that he had text messages between them to prove it.

101. Later that day, Volchek, Mendez, and Viracocha confirmed to Stafford that Rochester had told them that he did not know why Stafford had reported him for sexual harassment when she was actually the one constantly telling him that she wanted to have sex with him and that he had text messages between them to prove it.

102. That afternoon, Stafford sent a message to Johnson on Slack requesting another meeting with her.

103. Later that afternoon, Stafford had a video meeting with Johnson on Google Meet.

104. Stafford participated in this video meeting from a meeting room in Fiserv/Clover's Berkeley Heights office.  Stafford also had Deleon in the meeting room with her during this video meeting so that he could tell Johnson what Rochester had said to him about her.

105. During this meeting, Stafford complained to Johnson that she could no longer work with Rochester because she had heard from several co-workers, including Deleon, that while she was out from work the previous day, Rochester had told them that he did not know why she had reported him for sexual harassment when she was actually the one constantly telling him that she wanted to have sex with him and that he had text messages between them to prove it.  Deleon then confirmed to Johnson that Rochester had in fact told him, Volchek, Mendez, and Viracocha this during lunch the previous day.

106. In response, Johnson told Stafford that Fiserv/Clover would conduct an investigation into the matter, including interviewing everyone who was with Rochester at lunch the previous day.

- 16 -

107. On or around September 20, 2023, Stafford and Johnson had another video call on Google Meet. During this video call, Johnson informed Stafford that Fiserv/Clover had finished conducting its investigation and concluded that Rochester had in fact told Deleon, Volchek, Mendez, and Viracocha that he did not know why Stafford had reported him for sexual harassment when she was actually the one constantly telling him that she wanted to have sex with him and that he had text messages between them to prove it. Johnson also informed Stafford that Fiserv/Clover had "talked to" Rochester and told him that this type of behavior was not acceptable.

108. On or around July 26, 2024, Stafford left her employment with Fiserv/Clover.

109. Incredibly, Rochester was still employed by Fiserv/Clover at the time Stafford left her employment with Fiserv/Clover.

110. During Stafford's employment with Fiserv/Clover, Fiserv/Clover never implemented effective processes for the identification and elimination of unlawful sexual harassment in the workplace.

111. Upon information and belief, during the time that Stafford was employed by Fiserv/Clover, Fiserv/Clover never conducted sexual harassment training for its managers or staff.

112. During Stafford's employment with Fiserv/Clover, Fiserv/Clover did not have a consistent commitment to eradicate sexual harassment from the top of the organization.

113. During Stafford's employment with Fiserv/Clover, Fiserv/Clover did not consistently address sexual harassment in the workplace.

114. Fiserv/Clover knew of Rochester's sexual harassment of Stafford, but failed to take remedial measures to stop it.

**COUNT ONE**

**(Hostile Work Environment (Sex))**

115.    Plaintiff repeats and realleges the allegations set forth above as if set forth at length herein.

116.    Defendants violated the New Jersey Law Against Discrimination ("NJLAD") by harassing Plaintiff and creating a hostile work environment due to Plaintiff's sex.

117.    Defendants' actions were motivated by actual malice or were the result of a willful and wanton disregard for the harm to Plaintiff.

118.    Defendants have caused Plaintiff to suffer economic, physical, and emotional harm.

   **WHEREFORE**, Plaintiff demands judgment against Defendants and seeks back pay, front pay, lost benefits, emotional distress damages, other compensatory damages, punitive damages, interest, compensation for the negative tax consequences of receiving a damage award in the form of a one-time lump sum, attorney's fees, costs of suit, and such other relief that the Court may deem just and proper.

## COUNT TWO

**(Battery)**

119.    Plaintiff repeats and realleges the allegations set forth above as if set forth at length herein.

120.    Defendants acted intending to cause harmful or offensive contact with Plaintiff, or an imminent apprehension of such contact.

121.    Defendants caused harmful or offensive contact to Plaintiff.

122.    Plaintiff suffered physical and emotional harm as a result.

123.    Defendants' actions were motivated by actual malice or were the result of a willful and wanton disregard for the harm to Plaintiff.

   **WHEREFORE**, Plaintiff demands judgment against Defendants and seeks compensatory damages, nominal damages, punitive damages, interest, compensation for the negative tax

consequences of receiving a damage award in the form of a one-time lump sum, attorney's fees, costs of suit, and such other relief that the Court may deem just and proper.

## COUNT THREE

### (Retaliation for Making Complaints of Sexual Harassment)

124.     Plaintiff repeats and realleges the allegations set forth above as if set forth at length herein.

125.     Plaintiff made multiple complaints of sexual harassment to Defendants.

126.     Defendants violated the NJLAD by retaliating against Plaintiff for making complaints of sexual harassment.

127.     Defendants' actions were motivated by actual malice or were the result of a willful and wanton disregard for the harm to Plaintiff.

128.     Defendants have caused Plaintiff to suffer economic, physical, and emotional harm.

**WHEREFORE**, Plaintiff demands judgment against Defendants and seeks back pay, front pay, lost benefits, emotional distress damages, other compensatory damages, punitive damages, interest, compensation for the negative tax consequences of receiving a damage award in the form of a one-time lump sum, attorney's fees, costs of suit, and such other relief that the Court may deem just and proper.

## COUNT FOUR

### (Constructive Discharge)

129.     Plaintiff repeats and realleges the allegations set forth above as if set forth at length herein.

130.     Defendants knowingly permitted the continuation of discriminatory and retaliatory conditions in employment which were so intolerable that a reasonable person subjected to them would resign.

131.     As a result of these conditions, Plaintiff resigned from her employment with Defendants.

132.    Defendants' actions were motivated by actual malice or were the result of a willful and wanton disregard for the harm to Plaintiff.

133.    Defendants have caused Plaintiff to suffer economic, physical, and emotional harm.

**WHEREFORE**, Plaintiff demands judgment against Defendants and seeks back pay, front pay, lost benefits, emotional distress damages, other compensatory damages, punitive damages, interest, compensation for the negative tax consequences of receiving a damage award in the form of a one-time lump sum, attorney's fees, costs of suit, and such other relief that the Court may deem just and proper.

LAW OFFICES OF USMAAN SLEEMI LLC
Attorneys for Plaintiff

By: */s/ Usmaan Sleemi*
    Usmaan Sleemi, Esq.
    Law Offices of Usmaan Sleemi LLC
    66 Route 17 North, Suite 500
    Paramus, New Jersey  07652

Dated: October 3, 2024

- 20 -

## DEMAND FOR TRIAL BY JURY

Plaintiff Ciara Stafford demands a trial by jury on all issues.

**LAW OFFICES OF USMAAN SLEEMI LLC**
Attorneys for Plaintiff


By: */s/ Usmaan Sleemi*
     Usmaan Sleemi, Esq.


Dated: October 3, 2024


## DESIGNATION OF TRIAL COUNSEL

Usmaan Sleemi, Esq. is hereby designated as trial counsel in this matter.

**LAW OFFICES OF USMAAN SLEEMI LLC**
Attorneys for Plaintiff


By: */s/ Usmaan Sleemi*
     Usmaan Sleemi, Esq.


Dated: October 3, 2024

<u>**CERTIFICATION PURSUANT TO RULE 4:5-1**</u>

I, Usmaan Sleemi, certify as follows:

I am counsel for Plaintiff Ciara Stafford in this matter.  To the best of my knowledge, the matter in controversy is not the subject of any other action pending in any court or arbitration proceeding, and no other action or arbitration proceeding is contemplated, and no other parties, except for potentially Nherhu Rochester, should be joined to this action.

I certify that the foregoing statements are true.  I am aware that if any of the foregoing statements are willfully false, I am subject to punishment.

**LAW OFFICES OF USMAAN SLEEMI LLC**
Attorneys for Plaintiff


By: */s/ Usmaan Sleemi*
      Usmaan Sleemi, Esq.

Dated: October 3, 2024

# **Exhibit B**

UNION COUNTY SUPERIOR COURT
2 BROAD STREET
CIVIL DIVISION
ELIZABETH        NJ 07207

                                    TRACK ASSIGNMENT NOTICE
COURT TELEPHONE NO. (908) 787-1650
COURT HOURS  8:30 AM - 4:30 PM

                         DATE:  OCTOBER 03, 2024
                         RE:     STAFFORD CIARA  VS FISERV SOLUTIONS LLC
                         DOCKET: UNN L -003625 24

     THE ABOVE CASE HAS BEEN ASSIGNED TO:  TRACK 3.

     DISCOVERY IS   450 DAYS AND RUNS FROM THE FIRST ANSWER OR 90 DAYS
FROM SERVICE ON THE FIRST DEFENDANT, WHICHEVER COMES FIRST.

     THE PRETRIAL JUDGE ASSIGNED IS:  HON JOHN M. DEITCH

      IF YOU HAVE ANY QUESTIONS, CONTACT TEAM     002
AT:  (908) 787-1650 EXT 21493.

      IF YOU BELIEVE THAT THE TRACK IS INAPPROPRIATE YOU MUST FILE A
 CERTIFICATION OF GOOD CAUSE WITHIN 30 DAYS OF THE FILING OF YOUR PLEADING.
      PLAINTIFF MUST SERVE COPIES OF THIS FORM ON ALL OTHER PARTIES IN ACCORDANCE
WITH  R.4:5A-2.
                         ATTENTION:
                              ATT: USMAAN SLEEMI
                              USMAAN SLEEMI LLC
                              66 ROUTE 17 NORTH
                              STE 500
                              PARAMUS         NJ 07652


ECOURTS

# **Exhibit C**

**LAW OFFICES OF USMAAN SLEEMI LLC**
66 Route 17 North, Suite 500
Paramus, NJ  07652
T: 973.866.9415 | F: 973.775.9584
usleemi@sleemilaw.com
Attorneys for Plaintiff

| | |
|---|---|
| CIARA STAFFORD,<br><br>Plaintiff,<br><br>v.<br><br>FISERV SOLUTIONS LLC AND CLOVER NETWORK, INC.,<br><br>Defendants. | SUPERIOR COURT OF NEW JERSEY<br>UNION COUNTY – LAW DIVISION<br><br>DOCKET NO. UNN-L-003625-24<br><br>CIVIL ACTION<br><br>**ACKNOWLEDGMENT OF SERVICE OF SUMMONS AND COMPLAINT** |

The undersigned hereby acknowledges service of a copy of the Summons and Complaint in the above-captioned matter on this __6th__ day of October 2024.

SAUL EWING LLP
1001 Fleet Street
9th Floor
Baltimore, MD  21202
*Attorneys for Defendant Fiserv Solutions LLC*

By: _Gary B. Eidelman_
      Gary B. Eidelman, Esq.

# **Exhibit D**

**LAW OFFICES OF USMAAN SLEEMI LLC**
66 Route 17 North, Suite 500
Paramus, NJ  07652
T: 973.866.9415 | F: 973.775.9584
usleemi@sleemilaw.com
Attorneys for Plaintiff

|  |  |
|---|---|
| CIARA STAFFORD,<br><br>                              Plaintiff,<br><br>            v.<br><br>FISERV SOLUTIONS LLC AND CLOVER NETWORK, INC.,<br><br>                              Defendants. | SUPERIOR COURT OF NEW JERSEY<br>UNION COUNTY – LAW DIVISION<br><br>DOCKET NO. UNN-L-003625-24<br><br>CIVIL ACTION<br><br>**ACKNOWLEDGMENT OF SERVICE OF SUMMONS AND COMPLAINT** |

The undersigned hereby acknowledges service of a copy of the Summons and Complaint in the above-captioned matter on this  6th  day of October 2024.

SAUL EWING LLP
1001 Fleet Street
9th Floor
Baltimore, MD  21202
*Attorneys for Defendant Clover Network, Inc.*

By: *Gary B. Eidelman*
           Gary B. Eidelman, Esq.