# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| CIARA STAFFORD,<br><br>                    Plaintiff,<br><br>          v.<br><br>FISERV SOLUTIONS LLC AND CLOVER<br>NETWORKS, INC.,<br><br>                    Defendants. | Case No. 2:24-cv-10009-MEF-JRA<br><br>CIVIL ACTION<br><br>Motion Date: January 21, 2025 |

---

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO PARTIALLY
DISMISS PLAINTIFF'S COMPLAINT PURSUANT TO RULE 12(b)(6)**

---

**LAW OFFICES OF USMAAN SLEEMI LLC**
*Attorneys for Plaintiff*

Usmaan Sleemi, Esq.
66 Route 17 North, Suite 500
Paramus, NJ  07652
Tel: (973) 866-9415
usleemi@sleemilaw.com

## <u>TABLE OF CONTENTS</u>

**PRELIMINARY STATEMENT**................................................................................................1

**STATEMENT OF RELEVANT ALLEGED FACTS** ....................................................3

**STANDARD OF REVIEW** ................................................................................................17

**LEGAL ARGUMENT** .......................................................................................................**18**

I.    DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S BATTERY CLAIM IS MOOT. ........18

II.   PLAINTIFF HAS PLAUSIBLY ALLEGED MULTIPLE MATERIALLY ADVERSE ACTIONS SUCH THAT HER RETALIATION CLAIM SHOULD BE ALLOWED TO PROCEED..........18

III.  DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S CONSTRUCTIVE DISCHARGE IS MOOT. ....................................................................................................................................23

**CONCLUSION**....................................................................................................................**23**

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ......................................................................... 17

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .................................................... 17, 18

*Burlington Northern & Santa Fe Railway v. White*, 548 *U.S.* 53 (2006) .................. 18, 19, 21, 22

*Craig v. Suburban Cablevision*, 274 N.J. Super. 303 (App. Div. 1994) ...................................... 19

*Dagenais v. Wal-Mart Stores East, LP*, 3:23-cv-241 (SVN), 2023 WL 7220753 (D. Conn. Nov. 2, 2023) .................................................................................................................... 21

*Evancho v. Fisher*, 423 F.3d 347 (3d Cir. 2005) .......................................................... 17

*Fowler v. UPMC Shadyside*, 578 F.3d 203 (3d Cir. 2009) ........................................... 17

*Hasmi v. City of Jersey City*, No. 19-18884, 2021 WL 4059852 (D.N.J. Sept. 7, 2021) ............. 19

*Hedges v. United States*, 404 F.3d 744 (3d Cir. 2005). .............................................. 18

*Lehmann v. Toys 'R' Us,* 132 N.J. 587 (N.J. 1993) ...................................................... 22

*Livingston v. Roosevelt Union Free School District*, No. 17-CV-4189 (JMA) (SIL), 2020 WL 1172642 (E.D.N.Y. Jan. 15, 2020) ............................................................................. 22

*Marini v. Costco Wholesale Corp.*, 64 F.Supp.3d 317 (D. Conn. 2014) ................................... 21

*Moore v. City of Philadelphia*, 461 F.3d 331 (3d Cir. 2006) ........................................... 20

*Pavlik v. Potter*, Civ. No. 06-3015, 2008 WL 4757297 (D.N.J. Oct. 27, 2008) .......................... 21

*Phillips v. County of Allegheny*, 515 F.3d 224 (3d Cir. 2008) ......................................... 17

*Roa v. Roa*, 200 N.J. 555 (2010) .................................................................... 18, 19

*Scheuer v. Rhoades*, 416 U.S. 232 (1974) .................................................................. 17

*Spence v. Donahoe*, 515 F. App'x 561 (6th Cir. 2013) ..................................................... 22

*Young v. Hobert w. Grp.*, 385 N.J. Super. 448 (App. Div. 2005) .......................................... 19

**Statutes**

<u>N.J.S.A.</u> §§ 10:5-1 to -49 ............................................................................... 18

**Rules**

Fed. R. Civ. P. 12(b)(6) .................................................................................... 17

Fed. R. Civ. P. 8(a)(2) ..................................................................................... 17

## PRELIMINARY STATEMENT

This lawsuit arises out of Plaintiff's claims against her former employer, Defendant Clover Network, LLC ("Clover").  Plaintiff also asserts her claims against Clover's parent company, Fiserv Solutions LLC ("Fiserv") (Defendants Clover and Fiserv are collectively referred to herein as "Defendants").

Plaintiff was employed by Fiserv/Clover from on or around January 17, 2023 to on or around July 27, 2024.  Plaintiff alleges that, during her employment with Fiserv/Clover, Nherhu Rochester ("Rochester"), an extremely large and physically imposing male co-worker who worked on the same team as Plaintiff, regularly engaged in sexually inappropriate conduct towards her.  Plaintiff alleges that, as a result, she made several complaints to Fiserv/Clover about Rochester's sexually inappropriate conduct towards her, including two complaints to Clover's human resources department – one on or around August 29, 2023 and another one shortly thereafter – which resulted in Fiserv/Clover conducting an "investigation" into Plaintiff's allegations and allowing Plaintiff, whose cubicle was next to Rochester's, to change her seat in early September 2023.

Plaintiff alleges that, on or around the morning of September 11, 2023, after arriving to work that morning, she found Rochester – who had not been in the office since Plaintiff had returned to the office on or around September 7, 2023 after she had been working from home while Fiserv/Clover conducted its "investigation" – sitting in her new cubicle, causing her to have a panic attack.  Plaintiff alleges that, on or around September 13, 2023, she called out of work due to mental health reasons.  Plaintiff alleges that, the following day at work, several of her co-workers informed her that, while she was out of work the previous day, Rochester had told them that he did not understand why Plaintiff had reported him for sexual harassment when she was

actually the one constantly telling him that she wanted to have sex with him and that he had text messages between them to prove it. Plaintiff asserts that she left her employment with Fiserv/Clover on or around July 26, 2024 and that Rochester was still employed by Fiserv/Clover at the time that she left her employment with Fiserv/Clover.

Defendants argue that Count Three (retaliation for making complaints of sexual harassment) of Plaintiff's Complaint[1] should be dismissed because Plaintiff has failed to plead that Defendants took any adverse employment action against her because of her sexual harassment claims. This is nonsensical. Plaintiff has plausibly alleged multiple materially adverse actions such that her retaliation claim should be allowed to proceed. Specifically, Plaintiff alleges that the following occurred because she complained to Fiserv/Clover's human resources department about Rochester's sexually inappropriate conduct towards her: (1) she found Rochester waiting for her in her new seat after arriving to work on or around the morning of September 11, 2023, causing her to suffer a panic attack; (2) Rochester spread malicious lies about her and falsely painted a picture of her to co-workers as a mentally unstable and/or depraved female who pursued sexual relations with a co-worker and then turned around and made a false claim of sexual harassment against that co-worker; and (3) Fiserv/Clover allowed Rochester to continue working with Plaintiff even after Plaintiff reported his sexual misconduct against her to Fiserv/Clover.

Defendants' argument that Plaintiff has not sufficiently pled a retaliation claim against them is simply a desperate attempt by Defendants to avoid facing the consequences for repeatedly

---

[1] Defendants' motion also seeks to dismiss Count Two (battery) and Count Four (constructive discharge) of Plaintiff's Complaint. The parties, however, filed a joint stipulation of dismissal of Count Two and Count Four without prejudice on January 6, 2025. Thus, the portion of Defendants' motion to dismiss Count Two and Count Four of Plaintiff's Complaint is moot.

allowing Rochester to get away with his despicable and disgusting behavior in the workplace. Defendants have fallen woefully short of showing that Plaintiff has not plausibly alleged a retaliation claim against them and dismissing Plaintiff's retaliation claim from this case and allowing Defendants to escape accountability for Rochester's despicable and disgusting behavior at this early stage would offend any meaningful concept of justice.

<u>**STATEMENT OF RELEVANT ALLEGED FACTS**</u>

Fiserv, together with its subsidiaries, provides payments and financial services technology services in the United States, Europe, the Middle East, Africa, Latin America, the Asia-Pacific, and internationally.  (Complaint "Compl." ¶ 1).  Clover, a subsidiary of Fiserv, provides point-of-sale and business management solutions to small and mid-size businesses.  (Compl. ¶ 2).

Fiserv/Clover employed Plaintiff, a petite 28 year old woman, from on or around January 17, 2023 to on or around July 27, 2024.  (Compl. ¶ 10).  Plaintiff worked for Fiserv/Clover as a software engineering apprentice at Clover.  (Compl. ¶ 11).  Rochester, a 26 or 27 year old male competitive powerlifter, started at Fiserv/Clover as a software engineering apprentice at Clover around the same time as Plaintiff.  (Compl. ¶ 12).  Plaintiff and Rochester, along with Emil Deleon ("Deleon") and Botirjon Masharipob ("Masharipob"), two other software engineering apprentices at Clover, made up the Clover Sport support team.  (Compl. ¶ 13).

On or around April 19, 2023, Plaintiff and Rochester, who worked remotely for the first 90 days of their employment with Fiserv/Clover, began working at Fiserv/Clover's Berkley Heights, New Jersey office on a hybrid schedule, working at the office three days per week and remotely two days per week.  (Compl. ¶ 14).  Fiserv/Clover's Berkeley Heights office has an open layout, and all Fiserv/Clover employees, including management, work in the same space.  (Compl. ¶ 15).  At Fiserv/Clover's Berkeley Heights office, Rochester and Plaintiff sat side-by-

side in adjacent cubicles.  (Compl. ¶ 16).  During Plaintiff's employment with Fiserv/Clover, Rochester regularly made sexually inappropriate comments to Plaintiff, repeatedly sexually propositioned Plaintiff, and sexually assaulted Plaintiff on multiple occasions.  (Compl. ¶ 17).

Shortly after Plaintiff and Rochester began working at Fiserv/Clover's Berkeley Heights office, Rochester began making unwanted sexual advances towards and sexually inappropriate comments to Plaintiff.  (Compl. ¶ 18).  During Plaintiff's employment with Fiserv/Clover, software engineering apprentices regularly ate lunch together in the office building cafeteria, which is located on the first floor of the building.  (Compl. ¶ 19).  One day in or around late April 2023, Rochester, who was walking back to Fiserv/Clover's office from the office building cafeteria with Plaintiff after having just had lunch with Plaintiff and a few other software engineering apprentices, asked Plaintiff if she would go out on a date with him.  (Compl. ¶ 20). Plaintiff, who was surprised that a co-worker she barely knew and had not shown any interest in would ask her out on a date, told Rochester no and then quickly changed the subject.  (Compl. ¶ 20).  A day or two later, Rochester, who was walking back to Fiserv/Clover's office from the office building cafeteria with Plaintiff after having just had lunch with Plaintiff and a few other software engineering apprentices, asked Plaintiff if she would stop him if he tried to kiss her. (Compl. ¶ 21).  Plaintiff, who was shocked that Rochester would say something like this, especially after she had just turned him down, responded yes and then quickly changed the subject.  (Compl. ¶ 21).

On or around May 1, 2023, Rochester sent a direct message to Plaintiff on Instagram in "Vanish Mode," telling her how nice her lips are.  (Compl. ¶ 22).  Vanish Mode is a feature on Instagram that allows users to send self-destructing messages, i.e. messages that automatically disappear after the recipient of the message reads it.  (Compl. ¶ 22).

On or around the evening of May 4, 2023, Plaintiff exchanged several text messages with Rochester, making it clear that she would only be friends with him.  (Compl. ¶ 23).  During the course of this exchange, Rochester acknowledged that he had told Plaintiff that he wanted to kiss her.  (Compl. ¶ 23).

Despite Plaintiff making it clear to Rochester that she would only be friends with him, Rochester began to regularly make sexually inappropriate comments to Plaintiff, such as "You have a chokeable neck;" "it's difficult sitting next to you all day when I want to have sex with you so badly;" and telling Plaintiff, who had a hickey on one side of her neck, that "you should let me put a hickey on the other side of your neck."  (Compl. ¶ 24).

On or around the morning of May 12, 2023, Plaintiff and the other software engineering apprentices at Clover had a "standup meeting" with Adam Deane ("Deane"), Plaintiff's immediate supervisor and head of quality engineering at Fiserv, on Google Meet, a video communication service developed by Google.  (Compl. ¶ 25).  A stand up meeting is a regularly held gathering – typically daily – during which team members share status reports on their work.  (Compl. ¶ 26).  They are often held while attendees stand, which helps ensure a short check-in rather than a lengthy discussion.  (Compl. ¶ 26).

That afternoon, Deane, who was at the time working from Fiserv/Clover's Austin, Texas office and would not start working at Fiserv/Clover's Berkeley Heights office until late 2023, sent Plaintiff a message on Slack, a workplace messaging tool through which employees can exchange messages and files instantly, asking her if she was available for a one-on-one meeting.  (Compl. ¶ 27).  A few seconds later, Plaintiff sent a message to Deane in response saying that she was. (Compl. ¶ 27).  Deane then sent Plaintiff a Google Meet video call invitation on Slack, which Plaintiff immediately clicked on to join the Google Meet video call with Deane.  (Compl. ¶ 28).

During this one-on-one meeting, Deane and Plaintiff discussed what was and what was not going well at work so far. (Compl. ¶ 29). While discussing what was not going well at work, Plaintiff informed Deane that somebody on their team had been making unwanted advances towards her and inappropriate sexual comments to her, including sending her a message on Instagram in Vanish Mode saying how nice her lips are, and that, in an effort to get that person to stop, she had made clear to him that she would just friends with him, but that his sexually inappropriate behavior towards her was still continuing. (Compl. ¶ 29). In response, Deane told Plaintiff that if she was feeling uncomfortable, she should report the situation to human resources. (Compl. ¶ 29). Plaintiff told Deane that she was afraid of the person, but that she would again try to make it clear to him that she would just be friends with him. (Compl. ¶ 29).

A few minutes after Plaintiff and Deane's one-on-one meeting ended, Plaintiff sent Deane a screenshot of her May 4, 2023 text message exchange with Rochester – in which she made it clear that she would only be friends with him and in which Rochester acknowledged that he had told Plaintiff that he wanted to kiss her – on Slack. (Compl. ¶ 30). A few minutes later, Deane, in response, sent a sad panda bear emoji and an index finger pointing up emoji to Plaintiff. (Compl. ¶ 31). Fiserv/Clover did not take any action to stop Rochester's sexual harassment of Plaintiff after Plaintiff complained to Deane about Rochester's sexual harassment of her. (Compl. ¶ 32). Moreover, not only did Rochester continue to make sexually inappropriate comments to and unwanted sexual advances towards Plaintiff on a regular basis, his sexual harassment of Plaintiff escalated into sexual assault. (Compl. ¶ 33).

One day in or around late May 2023, Plaintiff, Rochester, and Masharipob went downstairs to the office building mailroom, which is located on the first floor of the office building, to check to see if some Clover point-of-sale devices that Deane had sent to each of them

to conduct software testing on had arrived.  (Compl. ¶ 34).  When Plaintiff, Rochester, and Masharipob arrived to the office building mailroom, Plaintiff was able to pick up the Clover point-of-sale device that Deane had sent to her.  (Compl. ¶ 35).  The Clover point-of-sale devices that Deane had sent to Rochester and Masharipob, however, had not yet arrived.  (Compl. ¶ 35).  After Plaintiff picked up the Clover point-of-sale device that Deane had sent to her, Plaintiff, Rochester, and Masharipob began to walk back to Fiserv/Clover's office.  (Compl. ¶ 36).  While Plaintiff, Rochester, and Masharipob were walking back to Fiserv/Clover's office, Rochester who was walking behind Plaintiff, began playing with Plaintiff's bra straps and touching the area of Plaintiff's body around her bra straps.  (Compl. ¶ 37).

A few days later, Plaintiff and several other software engineering apprentices at Clover – Fatima Kaba ("Kaba"), Aaron Mendez ("Mendez"), Gabriel Rivera ("Rivera"), and Rochester – had lunch together in the office building cafeteria.  (Compl. ¶ 38).  After Plaintiff, Kaba, Mendez, Rivera, and Rochester finished eating lunch, they went outside to the office building's courtyard.  (Compl. ¶ 39).  After entering the office building's courtyard, Rochester and Mendez sat down at a chess board table that was in the courtyard and began playing chess, while Plaintiff, Kaba, and Rivera sat on a bench next to the chess board table where Rochester and Mendez were playing chess.  (Compl. ¶ 40).  While Rochester and Mendez were playing chess, Rochester, who is extremely large and physically imposing, turned to Rivera and Kaba, who were engaged in conversation with each other, and said, "One thing I can't stand is when people are talking while I'm playing chess.  The last time someone did that, I almost fought them."  (Compl. ¶ 41).

On or around May 25, 2023, Plaintiff and Deane had another one-on-one video meeting on Google Meet.  (Compl. ¶ 42).  During this meeting, Plaintiff informed Deane that the same person who was sexually harassing her had threatened Rivera and Kaba while he was playing

chess in the office building courtyard with another software engineering apprentice and proceeded to tell Deane about the incident. (Compl. ¶ 42). Plaintiff then told Deane that everyone on the team seemed afraid of this person because he was a large male powerlifter. (Compl. ¶ 42). Deane, who was well aware that Rochester was a powerlifter since Rochester always brought up his powerlifting during stand up meetings, told Plaintiff that those things would not happen once he started working from Fiserv/Clover's Berkeley Heights office. (Compl. ¶ 42). Fiserv/Clover did not take any action to stop Rochester's sexual harassment of Plaintiff even after Plaintiff complained to Deane a second time about Rochester's sexual harassment of her and Rochester's sexual harassment of Plaintiff continued. (Compl. ¶ 43).

One day in or around June 2023, several software engineering apprentices at Clover, including Plaintiff and Rochester, went downstairs to the office building cafeteria to have lunch together. (Compl. ¶ 44). Because the stairwell in Fiserv/Clover's office leads directly to the office building cafeteria, the software engineering apprentices almost always took the stairwell to the building cafeteria. (Compl. ¶ 45). On that particular day, Plaintiff, who was the last one to enter the stairwell, saw Rochester, who was walking in front of her, stop to wait for her. (Compl. ¶ 46). Once Plaintiff caught up to Rochester, Rochester let Plaintiff pass him. (Compl. ¶ 47). After Plaintiff passed Rochester, Rochester grabbed Plaintiff from behind and pulled her against his crotch, pressing his penis into her buttocks. (Compl. ¶ 48). Plaintiff, who is approximately half of Rochester's weight, pushed Rochester off of her and then continued down the stairwell to the office building cafeteria. (Compl. ¶ 48). Soon thereafter, Plaintiff, in the hopes that Rochester would stop his sexually inappropriate behavior with her, told Rochester that she was seeing someone. (Compl. ¶ 49). After Plaintiff told Rochester this, Rochester backed off from Rochester for a couple weeks. (Compl. ¶ 50).

One day in or around July 2023, Rochester, who had seemingly changed his behavior towards Plaintiff, asked Plaintiff if she wanted to go to Chick-fil-A for lunch.  (Compl. ¶ 51).  Plaintiff, who thought Rochester had finally changed his behavior and wanted to maintain a good relationship with all of her co-workers, told him that she would go.  (Compl. ¶ 51).  That day, Plaintiff and Rochester drove to the Chick-fil-A in Watchung, New Jersey in Rochester's car and had lunch there.  (Compl., ¶ 52).  After having lunch at the Chick-fil-A in Watchung, Plaintiff and Rochester drove back to Fiserv/Clover's Berkeley Heights office in Rochester's car.  (Compl. ¶ 53).  Rochester did not say or do anything inappropriate during this lunch or during the drive to or from Chick-fil-A.  (Compl. ¶ 54).

Approximately one week later, Rochester, who had been maintaining his appropriate behavior with Plaintiff, again asked Plaintiff if she wanted to go to Chick-fil-A for lunch.  (Compl. ¶ 55).  Plaintiff, who believed that Rochester had changed and wanted to maintain a good relationship with her co-workers, told him that she would go.  (Compl. ¶ 55).  That day, Plaintiff and Rochester drove to the Chick-fil-A in Watchung in Rochester's car and had lunch there. (Compl. ¶ 56).  After Plaintiff and Rochester finished having lunch at the Chick-fil-A in Watchung, Plaintiff and Rochester got back into Rochester's car to go back to Fiserv/Clover's Berkeley Heights office.  (Compl. ¶ 57).  A few seconds after Plaintiff and Rochester got into Rochester's car, Rochester grabbed Plaintiff's face and pulled it towards him and kissed her. (Compl. ¶ 58).  Plaintiff immediately pulled away from Rochester and told him that they needed to get back to the office.   (Compl. ¶ 58).   Rochester and Plaintiff then drove back to Fiserv/Clover's office in Rochester's car.  (Compl. ¶ 59).

One day in or around early August 2023, Rochester told Plaintiff that Deane had told him that Fiserv/Clover was going to convert him and Deleon into full-time employees and was going

to let Plaintiff and Masharipob go once their apprenticeship was over. (Compl. ¶ 60). Around this same time, Plaintiff, who had been selected by Clover/Fiserv for a part in a commercial for the Clover software engineering apprenticeship program, found out from several co-workers that Rochester had been telling other Fiserv/Clover employees that the only reason that Plaintiff, who is a Black woman, had been selected for a part in the commercial was because she is a Black woman. (Compl. ¶ 61).

Soon thereafter, Plaintiff had a one-on-one video meeting with Deane, who was still working from Fiserv/Clover's Austin, Texas office, on Google Meet. (Compl. ¶ 62). During this meeting, Plaintiff, who had just about had it with Rochester, complained to Deane that Rochester had told her that Deane had informed him that Fiserv/Clover was going to convert Rochester and Deleon into full-time employees and was going to let Plaintiff and Masharipob go at the end of the apprenticeship and had been telling their co-workers that the only reason that Fiserv/Clover had given her a part in a commercial is because she is a Black woman. (Compl. ¶ 62). Plaintiff then complained to Deane that Rochester was "toxic" and that she did not understand how Fiserv/Clover could allow Rochester, who was also the one who was sexually harassing her and the one who had threatened Rivera and Kaba while playing chess, to continue getting away with his behavior. (Compl. ¶ 62). Deane, however, ignored Plaintiff's complaints about Rochester and re-directed the conversation into trying to convince Plaintiff that Rochester had "misconstrued" what he had told Rochester. (Compl. ¶ 63). Fiserv/Clover did not take any action to stop Rochester's sexual harassment of Plaintiff even after Plaintiff complained to Deane a third time about Rochester's sexual harassment of her and Rochester's sexual harassment of Rochester continued. (Compl. ¶ 64). Thereafter, Rochester continued to make sexually inappropriate comments to Plaintiff on a regular basis. (Compl. ¶ 65).

One day in or around early August 2023, Rochester told Plaintiff, who was wearing a dress that day, "You have a dress on today, so we should definitely go to Chick-fil-A." (Compl. ¶ 66). Plaintiff declined Rochester's invitation. (Compl. ¶ 66).

On or around August 29, 2023, Deleon called a team meeting with all of the software engineering apprentices at Clover, including Plaintiff and Rochester. (Compl. ¶ 67). During this meeting, Deleon, who had no authority over any of the other software engineering apprentices, told each of the other software engineering apprentices what they needed to be working on and what they should be doing, which appeared to offend the other software engineering apprentices. (Compl. ¶ 68).

Immediately after the meeting, Rochester, who appeared to be perturbed about what had just transpired in the meeting, asked Plaintiff if she could go for a walk with him around the office. (Compl. ¶ 69). Plaintiff, who herself was taken aback about what had just transpired in the meeting and wanted to talk about it, told Rochester yes. (Compl. ¶ 69). Rochester and Plaintiff then walked out of Fiserv/Clover's office and started talking about what had just transpired in the meeting. (Compl. ¶ 70). While Rochester and Plaintiff were walking and talking, Plaintiff noticed that Rochester was headed towards the fourth floor elevators. (Compl. ¶ 71). When Plaintiff realized that Rochester was walking towards the fourth floor elevators, Plaintiff asked Rochester why they were going to the elevator. (Compl. ¶ 72). Rochester told Plaintiff that he had to get his chapstick from his car and told Plaintiff that she should come with him so that they could continue their conversation. (Compl. ¶ 72). Rochester and Plaintiff then took the elevator to the first floor of the office building. (Compl. ¶ 73). After arriving to the first floor of the office building, Rochester and Plaintiff exited the elevator on the first floor and then walked outside to the parking lot to Rochester's car. (Compl. ¶ 74). Rochester and Plaintiff continued to talk about

the meeting with Deleon while walking to Rochester's car.  (Compl. ¶ 75).  Once Rochester and

Plaintiff got to Rochester's car, Rochester and Plaintiff stood outside of Rochester's car and

continued to discuss the meeting.  (Compl. ¶ 76).  While Rochester and Plaintiff were discussing

the meeting outside of Rochester's car, Rochester told Plaintiff that they still had 15 minutes until

they had to go back inside and should finish the conversation in his car.  (Compl. ¶ 77).  Plaintiff,

who suspected that Rochester was going to try something inappropriate with her and wanted to

have an audio recording of his inappropriate behavior to give to Fiserv/Clover since Fiserv/Clover

did not do anything in response to her previous complaints about Rochester, opened the Voice

Memos application on her iPhone and pressed the record button and then got into the front

passenger seat of Rochester's car while Rochester got into the driver's seat of his car.  (Compl. ¶

78).

A few minutes after getting into Rochester's car, Rochester changed the topic of

conversation to Plaintiff's part in the commercial that Fiserv/Clover had just shot for the Clover

software engineering apprenticeship program.  (Compl. ¶ 79).  While Rochester and Plaintiff were

discussing the commercial, Rochester abruptly said to Plaintiff, "Can I tell you that I really want

to kiss you?"  (Compl. ¶ 80).  Rochester then grabbed Plaintiff and tried to kiss her.  (Compl. ¶

81).  Plaintiff pushed Rochester off of her.  (Compl. ¶ 81).  A few seconds later, Rochester again

grabbed Plaintiff and tried to kiss her.  (Compl. ¶ 82).  Plaintiff pushed Rochester off of her again

and told him that they needed to get back to work.  (Compl. ¶ 82).  Plaintiff then got out of

Rochester's car and walked back to Fiserv/Clover's office.  (Compl. ¶ 83).

That afternoon, Plaintiff sent a message to Mardel Nesby ("Nesby"), the vice president of

human resources at Clover, on Slack saying that she needed to talk to someone about an incident

involving a co-worker.  (Compl. ¶ 84).  A few minutes later, Nesby sent Plaintiff a message on

Slack telling her to schedule a meeting with him and a link to his Calendly, a meeting scheduling software.  (Compl. ¶ 84).  Almost immediately thereafter, Plaintiff scheduled a meeting with Nesby for later that afternoon.  (Compl. ¶ 85).

Later that afternoon, Plaintiff had a video meeting with Nesby on Google Meet.  (Compl. ¶ 86).  During this meeting, Plaintiff complained to Nesby that, earlier that day, Rochester had lured her to his car, where he tried to kiss her against her will twice and told Nesby that she had recorded the incident on her phone.  (Compl. ¶ 87).  Plaintiff also complained to Nesby that Rochester had been sexually harassing her on a regular basis since she started working from the office and reported several of the other sexual harassment incidents to Nesby – including the incident in which Rochester had played with her bra straps and touched the area of her body around her bra straps, the incident in which Rochester grabbed her from behind and pulled her against his crotch, pressing his penis into her buttocks, and a number of the sexually inappropriate comments that Rochester had made to her – and told Nesby that, in an effort to get Rochester to stop, she had made it clear to him very early on that she would just be friends with him, but that, despite this, his sexually inappropriate behavior towards her continued.  (Compl. ¶ 87).  Further, Plaintiff informed Nesby that she and the other software engineering apprentices were afraid of Rochester because he was a large male powerlifter with a short temper who had threatened other employees before and told Nesby about the incident in which Rochester threatened Rivera and Kaba while he was playing chess in the office building courtyard with Mendez.  (Compl. ¶ 87).

In response, Nesby asked Plaintiff if she would feel more comfortable sharing details of Rochester's sexually inappropriate behavior towards her with Brenna Johnson ("Johnson"), the director of human resources at Clover, since Johnson is a woman.  (Compl. ¶ 88).  Plaintiff told Nesby that she would be more comfortable talking about the situation with Johnson since she is

- 13 -

a woman. (Compl. ¶ 88). Nesby then told Plaintiff that he would arrange a meeting between her and Johnson and then concluded the meeting by telling Plaintiff that Fiserv/Clover would be conducting an investigation into her allegations and that it was possible that the investigation could lead to either the termination of her or Rochester's employment. (Compl. ¶ 89). A few minutes after Plaintiff's meeting with Nesby concluded, Plaintiff sent the audio recording of Rochester trying to kiss her against her will in his car to Nesby on Slack. (Compl. ¶ 90).

A few days later, Plaintiff had a video meeting with Johnson on Google Meet. (Compl. ¶ 91). During this video meeting, Plaintiff told Johnson that Rochester had been sexually harassing her since she began working from the office and reported the incidents of sexual harassment to Johnson. (Compl. ¶ 91). Plaintiff also told Johnson that, in an effort to get Rochester to stop, she had made it clear to him very early on that she would just be friends with him, but that, despite this, his sexually inappropriate behavior towards her continued. (Compl. ¶ 91). In response, Johnson told Plaintiff that Fiserv/Clover would be conducting an investigation into her allegations and that she could work from home during that time. (Compl. ¶ 92). The next few days, Plaintiff worked from home while Fiserv/Plaintiff conducted an "investigation" into Plaintiff's allegations. (Compl. ¶ 93).

One day in or around early September 2023, Plaintiff had a video meeting with Johnson and Deane on Google Meet. (Compl. ¶ 94). During that video meeting, Johnson informed Plaintiff that Fiserv/Clover had completed its investigation of her allegations and was able to "substantiate" most of them. (Compl. ¶ 94). After informing Plaintiff of the conclusions of Fiserv/Clover's investigation, Johnson asked Plaintiff whether she would like her seat moved or whether she wanted Fiserv/Clover to move Rochester's seat. (Compl. ¶ 94). Plaintiff told Johnson that Fiserv/Clover should move her seat because she was afraid of Rochester and was

not sure what he would do if she had Fiserv/Clover move his seat. (Compl. ¶ 94). At the end of the meeting, Plaintiff asked Johnson if Rochester speaking negatively about her after she reported him for sexual harassment would be considered retaliation. (Compl. ¶ 95). Johnson responded that it would be. (Compl. ¶ 95).

On or around September 7, 2023, Plaintiff returned to work at Fiserv/Clover's Berkeley Heights office. (Compl. ¶ 96). On or around the morning of September 11, 2023, Plaintiff, after arriving to work that morning, found Rochester – who had not been in the office since she had returned to the office on or around September 7, 2023 – sitting in her new cubicle, causing her to have a panic attack. (Compl. ¶ 97).

On or around September 13, 2023, Plaintiff called out of work for mental health reasons. (Compl. ¶ 98). That evening, Daniel Volchek ("Volchek"), another software engineering apprentice at Clover, called Plaintiff and informed her that Rochester had said some things about her to him, Deleon, Mendez, and Johnny Viracocha ("Viracocha"), another software engineering apprentice at Clover, during lunch that day, but that he did not want to share what Rochester had said because he did not want to upset her. (Compl. ¶ 99).

The following day at work, Deleon informed Plaintiff that, while she was out of work the previous day, Rochester had told him, Volchek, Mendez, and Viracocha that he did not understand why Plaintiff had reported him for sexual harassment when she was actually the one constantly telling him that she wanted to have sex with him and that he had text messages between them to prove it. (Compl. ¶ 100). Later that day, Volchek, Mendez, and Viracocha confirmed to Plaintiff that Rochester had told them that he did not know why Plaintiff had reported him for sexual harassment when she was actually the one constantly telling him that she wanted to have sex with him and that he had text messages between them to prove it. (Compl. ¶ 101).

- 15 -

That afternoon, Plaintiff sent a message to Johnson on Slack requesting another meeting with her. (Compl. ¶ 102). Later that afternoon, Plaintiff had a video meeting with Johnson on Google Meet. (Compl. ¶ 103). Plaintiff participated in this video meeting from a meeting room in Fiserv/Clover's Berkeley Heights office. (Compl. ¶ 104). Plaintiff also had Deleon in the meeting room with her during this video meeting so that he could tell Johnson what Rochester had said to him about her. (Compl. ¶ 104). During this meeting, Plaintiff complained to Johnson that she could no longer work with Rochester because she had heard from several co-workers, including Deleon, that while she was out from work the previous day, Rochester had told them that he did not know why she had reported him for sexual harassment when she was actually the one constantly telling him that she wanted to have sex with him and that he had text messages between them to prove it. (Compl. ¶ 105). Deleon then confirmed to Johnson that Rochester had in fact told him, Volchek, Mendez, and Viracocha this during lunch the previous day. (Compl. ¶ 105). In response, Johnson told Plaintiff that Fiserv/Clover would conduct an investigation into the matter, including interviewing everyone who was with Rochester at lunch the previous day. (Compl. ¶ 106).

On or around September 20, 2023, Plaintiff and Johnson had another video call on Google Meet. (Compl. ¶ 107). During this video call, Johnson informed Plaintiff that Fiserv/Clover had finished conducting its investigation and concluded that Rochester had in fact told Deleon, Volchek, Mendez, and Viracocha that he did not know why Plaintiff had reported him for sexual harassment when she was actually the one constantly telling him that she wanted to have sex with him and that he had text messages between them to prove it. (Compl. ¶ 107). Johnson also informed Plaintiff that Fiserv/Clover had "talked to" Rochester and told him that this type of behavior was not acceptable. (Compl. ¶ 107).

On or around July 26, 2024, Plaintiff left her employment with Fiserv/Clover.  (Compl. ¶ 108).  Incredibly, Rochester was still employed by Fiserv/Clover at the time Plaintiff left her employment with Fiserv/Clover.  (Compl. ¶ 109).

## STANDARD OF REVIEW

When considering a motion to dismiss a complaint for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6), a court must accept all well-pleaded allegations in the complaint as true and view them in the light most favorable to the plaintiff. *Evancho v. Fisher*, 423 F.3d 347, 350 (3d Cir. 2005).  It is well settled that a pleading is sufficient if it contains "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).

A district court, in weighing a motion to dismiss, asks " 'not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claim.' " *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 563 n. 8 (2007) (quoting *Scheuer v. Rhoades*, 416 U.S. 232, 236 (1974)); *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . . " (citation omitted)).  Under the *Twombly/Iqbal* standard, the Third Circuit has instructed a two-part analysis.  First, a claim's factual and legal elements should be separated; a "district court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-211 (3d Cir. 2009) (internal citation omitted).

Second, a district court "must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.' " *Id.* at 211 (internal quotation and citation omitted).  "[A] complaint must do more than allege the plaintiff's entitlement to relief."  *Id.; see Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008)

("The Supreme Court's *Twombly* formulation of the pleading standard can be summed up thus: 'stating . . . a claim requires a complaint with enough factual matter (taken as true) to suggest' the required element. This 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element." (quoting *Twombly*, 550 U.S. at 556)).   The defendant bears the burden of showing that no claim has been presented.  *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005).

## LEGAL ARGUMENT

### I.   DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S BATTERY CLAIM IS MOOT.

Defendants' motion seeks to dismiss Count Two (battery) of Plaintiff's Complaint.  The parties, however, filed a joint stipulation of dismissal of Count Two without prejudice on January 6, 2025.  Thus, Defendants' motion to dismiss Count Two of Plaintiff's Complaint is moot.

### II.   PLAINTIFF HAS PLAUSIBLY ALLEGED MULTIPLE MATERIALLY ADVERSE ACTIONS SUCH THAT HER RETALIATION CLAIM SHOULD BE ALLOWED TO PROCEED.

Plaintiff has plausibly alleged multiple materially adverse actions such that her retaliation claim should be allowed to proceed.  In *Roa v. Roa*, 200 N.J. 555 (2010), the New Jersey Supreme Court explained that the scope of actionable retaliatory conduct under the New Jersey Law Against Discrimination, N.J.S.A. §§ 10:5-1 to -49 ("LAD") is broader than the employment-related acts prohibited by the LAD's anti-discrimination provision.  *Id.* at 572-574.  In considering "how harmful an act of retaliatory discrimination must be" in order to be actionable under the LAD, the Court adopted the Title VII standard established by the United States Supreme Court in *Burlington Northern & Santa Fe Railway v. White*, 548 U.S. 53, 61, 68 (2006).  *Roa*, *supra*, 200 N.J. at 575.  The test is whether " 'a reasonable employee would have found the challenged

action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.' " *Ibid.* (quoting *Burlington Northern*, *supra*, 548 U.S. at 61, 68) (internal quotations omitted).  Thus, a plaintiff need not establish that the action adversely affected the terms and conditions of his or her employment under the LAD's anti-retaliation provision, but must instead only show that the employer's actions could dissuade a reasonable employee from engaging in protected conduct under the LAD.  Indeed, "the protection against retaliation embodied in the LAD is broad and pervasive, and must be seen as necessarily designed to promote the integrity of the underlying antidiscrimination policies of the Act . . . . " *Young v. Hobert w. Grp.*, 385 N.J. Super. 448, 465 (App. Div. 2005) (alteration in original) (quoting *Craig v. Suburban Cablevision*, 274 N.J. Super. 303, 310 (App. Div. 1994)).

This standard is objective in that it asks what the "*reasonable* employee" would believe. *Burlington Northern*, 548 U.S. at 68.  And it is fact intensive in that the "significance of any given act of retaliation will often depend upon the particular circumstances.  Context matters."  *Id.* at 69.  "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed."  *Id.* (internal quotation marks and citations omitted).  For example, while "[a] schedule change in an employee's work schedule may make little difference to many workers," such a change "may matter enormously to a young mother with school-age children," and while "[a] supervisor's refusal to invite an employee to lunch is normally trivial," "excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination."  *Id.*; *accord Hasmi v. City of Jersey City*, No. 19-18884,

2021 WL 4059852, at *10 (D.N.J. Sept. 7, 2021); *see also Moore v. City of Philadelphia*, 461 F.3d 331, 348 (3d Cir. 2006), *as amended* (Sept. 13, 2006) ("We find that a reasonable jury could conclude that a lateral transfer from the district where a police officer had earned goodwill and built positive relations with the community over time is the kind of action that might dissuade a police officer from making or supporting a charge of unlawful discrimination within his squad.").

Here, Plaintiff's Complaint contains multiple plausible allegations of materially adverse actions that, taken alone or together, would certainly dissuade a reasonable worker from complaining about sexual harassment. Fiserv/Clover employed Plaintiff, a petite woman, at Clover, a subsidiary of Fiserv, from on or around January 17, 2023 to on or around July 27, 2024. (Compl. ¶ 10). Plaintiff worked for Fiserv/Clover as a software engineering apprentice at Clover. (Compl. ¶ 11). Plaintiff alleges that during her employment at Fiserv/Clover, Rochester, a 26 or 27 year old male competitive powerlifter who started at Fiserv/Clover as a software engineering apprentice at Clover around the same time as Plaintiff and worked on the same team as Plaintiff, regularly made sexually inappropriate comments to Plaintiff, repeatedly sexually propositioned Plaintiff, and sexually assaulted Plaintiff on multiple occasions. (Compl. ¶¶ 12, 17). Plaintiff asserts that she made two complaints – one on or around August 29, 2023 and another one shortly thereafter – to Clover's human resources department about Rochester's sexual inappropriate conduct towards her. (Compl. ¶¶ 67-91). Plaintiff asserts that she then worked from home the next few days while Fiserv/Clover conducted an investigation into her allegations. (Compl. ¶ 93). Plaintiff asserts that, in or around early September 2023, Fiserv/Clover informed her that it had completed its investigation of her allegations and allowed her to change her seat. (Compl. ¶ 94). Plaintiff asserts that she returned to work at Fiserv/Clover's Berkeley Heights office on or around September 7, 2023. (Compl. ¶ 96). Plaintiff alleges that on or around the morning of September

11, 2023, after arriving to work that morning, she found Rochester – who had not been in the office since she had returned to the office on or around September 7, 2023 – sitting in her new seat, causing her to have a panic attack.   (Compl. ¶ 97).   Plaintiff also alleges that other Fiserv/Clover employees, including her, were afraid of Rochester, who is extremely large and physically imposing and had previously threatened two other Clover software engineering apprentices with violence in front of her.   (Compl. ¶¶ 29, 38-42, 87, 94).   Moreover, Plaintiff alleges that Rochester, who was on the same team as her, was still employed by Fiserv/Clover when Plaintiff left her employment with Fiserv/Clover on or around July 26, 2024.   (Compl. ¶¶ 13, 109).   It can reasonably be inferred from these allegations that Plaintiff's harasser, an extremely large and physically imposing male powerlifter who had threatened other workers in front of Plaintiff and who Plaintiff was afraid of, was attempting to intimidate Plaintiff, a petite woman, for reporting his sexual misconduct against her and that Fiserv/Clover allowed Plaintiff's harasser to continue working with Plaintiff even after Plaintiff reported his sexual misconduct against her to Fiserv/Clover.   These things would certainly dissuade a reasonable worker from complaining about sexual harassment.   *See, e.g.*, *Pavlik v. Potter*, Civ. No. 06-3015, 2008 WL 4757297, at *1, *8 (D.N.J. Oct. 27, 2008) (finding that "incident, in which [the plaintiff's harasser] was asked to work on the [small parcel bundle] sorter and sat in [p]laintiff's seat" after the plaintiff had reported harassment to supervisor and had her seat changed so she would not be next to her harasser "could be materially adverse"); *Dagenais v. Wal-Mart Stores East, LP*, 3:23-cv-241 (SVN), 2023 WL 7220753, at *4 (D. Conn. Nov. 2, 2023)[2] ("The Court finds it reasonable

---

[2] *Dagenais*, 2023 WL 7220753 involves a retaliation claim under the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-60(b)(8) ("CFEPA").   Like LAD retaliation claims, CFEPA retaliation claims are analyzed under the same burden-shifting framework established for Title VII retaliation cases in *Burlington Northern*, 548 U.S. 53.   *See Marini v. Costco Wholesale Corp.*, 64 F.Supp.3d 317, 332 (D. Conn. 2014) (noting that CFEPA retaliation claims are analyzed under the same burden-shifting framework established for Title VII retaliation cases).

- 21 -

to infer from Plaintiff's complaint that allowing her alleged assailant to return to work in the same department in which she worked could 'dissuade a reasonable worker from making or supporting' a similar report in the future.  Thus, Plaintiff may proceed with her retaliation claim[.]") (internal citation omitted); *Livingston v. Roosevelt Union Free School District*, No. 17-CV-4189 (JMA), 2020 WL 1172642, at *1, *9 (E.D.N.Y. Jan. 15, 2020) (finding it "plausible that a reasonable worker might have been dissuaded from commencing [lawsuit against school district and the then-assistant school principal, claiming that the then-assistant school principal had sexually harassed her,] if she knew that her alleged harasser would someday be rehired to work with her.").

Plaintiff also alleges that on or around September 13, 2023, Rochester told numerous Fiserv/Clover employees that he did not understand why Plaintiff had reported him for sexual harassment when she was actually the one constantly telling him that she wanted to have sex with him and that he had text messages between them to prove it.  (Compl. ¶¶ 100-107).  A reasonable worker would certainly be dissuaded from making a complaint of sexual harassment if she knew that her harasser would spread malicious lies about her and falsely paint a picture of her to co-workers as a mentally unstable and/or depraved female who pursued sexual relations with a co-worker and then turned around and made a false claim of sexual harassment against that co-worker. Accordingly, Plaintiff's Complaint contains multiple plausible allegations of materially adverse actions that, taken alone or together, would certainly dissuade a reasonable worker from complaining about sexual harassment.  *See Spence v. Donahoe*, 515 F. App'x 561, 575 (6th Cir. 2013)[3] (even where a single action may not be materially adverse "multiple incidents when taken

---

[3] *Spence v. Donahoe*, 515 F. App'x 561 is a Title VII retaliation case.  As pointed out above, in considering how harmful an act of retaliatory discrimination must be in order to be actionable under the LAD, the New Jersey Supreme Court adopted the Title VII standard established by the United States Supreme Court in *Burlington Northern & Santa Fe Railway v. White*, 548 U.S. 53.  Further, New Jersey courts have adopted a policy of looking to Title VII for guidance when interpreting provisions of the LAD.  *See Lehmann v. Toys 'R' Us*, 132 N.J. 587, 600 (N.J. 1993) ("In construing the terms of the LAD, this Court has frequently looked to federal precedent governing Title VII of the Civil Rights Act of 1964 as a key source of interpretive authority.") (internal citations and quotations omitted).

together might dissuade a reasonable worker from making or supporting a discrimination charge.") (internal citation and quotation omitted).

Moreover, while it is not alleged in Plaintiff's Complaint, Plaintiff maintains that Fiserv/Clover failed to inform those Fiserv/Clover employees who Rochester had spread his malicious lies about Plaintiff to that what Rochester had told them about the situation was not true. Such facts would only further serve to bolster Plaintiff's retaliation claim. Indeed, a reasonable worker would only further be dissuaded from making a complaint of sexual harassment if she knew that her harasser would falsely paint a picture of her to co-workers as a mentally unstable and/or depraved female who pursued sexual relations with a co-worker and then turned around and made a false claim of sexual harassment against that co-worker and that her employer, after finding out about this, would fail to inform those co-workers that what her harasser had told them was not true, thus allowing those co-workers to potentially think that she is a mentally unstable and/or depraved person.

## III.    DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S CONSTRUCTIVE DISCHARGE IS MOOT.

Defendants' motion seeks to dismiss Count Four (constructive discharge) of Plaintiff's Complaint. The parties, however, filed a joint stipulation of dismissal of Count Four without prejudice on January 6, 2025. Thus, Defendants' motion to dismiss Count Four of Plaintiff's Complaint is moot.

<u>CONCLUSION</u>

For the foregoing reasons, Defendants' motion to dismiss Count Two (battery), Count Three (retaliation for making complaints of sexual harassment), and Count Four (constructive discharge) of Plaintiff's Complaint should be denied.

Respectfully submitted,

**LAW OFFICES OF USMAAN SLEEMI LLC**
Attorneys for Plaintiff

*/s/ Usmaan Sleemi*
Usmaan Sleemi, Esq.

## <u>CERTIFICATE OF SERVICE</u>

I, USMAAN SLEEMI, hereby certify that, on January 7, 2025, the foregoing Plaintiff's Brief in Opposition to Defendants' Motion to Partially Dismiss Plaintiff's Complaint was electronically filed and served through the Court's CM/ECF system upon the following counsel of record:

> Erik P. Pramschufer
> Saul Ewing LLP
> 1270 Avenue of the Americas, Suite 2800
> New York, NY 10020
> erik.pramschufer@saul.com
> *Attorneys for Defendants*

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, then I may be subject to punishment.

*/s/ Usmaan Sleemi*
Usmaan Sleemi, Esq.